IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| D.L., a Minor Child, by and through her Parents and Next Friends, DUC LE and ANH LE,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>OMAHA PUBLIC SCHOOLS,<br><br>　　　　　　Defendant. | 8:25CV402<br><br>MEMORANDUM<br>AND ORDER |

　　　This matter is before the Court on cross-motions for Judgment on the Administrative Record filed pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, by plaintiffs D.L. ("D.L."), a minor child, by and through her parents and next friends, Duc Le and Anh Le (the "Les" and collectively, the "plaintiffs") (Filing No. 24) and by defendant Omaha Public Schools ("OPS") (Filing No. 28). The plaintiffs contend OPS failed to provide D.L. a free appropriate public education ("FAPE") in the least restrictive environment ("LRE") as required by the IDEA. *See id.* §§ 1401(9), 1421(a)(1). OPS maintains that it did.

　　　For the reasons stated below, the plaintiffs' motion is denied and OPS's motion is granted. The plaintiffs' IDEA claims are dismissed with prejudice.

**I.　　BACKGROUND**[1]

　　　D.L. is eight years old and has autism. She lives with her parents within the boundaries of OPS. Her neighborhood (or "home") school is Saddlebrook Elementary School ("Saddlebrook"). In 2018, D.L. was evaluated by OPS's Early Development Network as a result of concerns related to speech. Based on that evaluation, OPS

---

[1]Most of the background is drawn from the parties' respective statements of fact.

determined D.L. qualified for intervention due to developmental delay, but it did not determine that D.L. had an intellectual or cognitive disability at that time. OPS did not formally evaluate her again.[2] The plaintiffs note that one purpose of an evaluation is to determine the nature and extent of the special-education services a child may need.

Amber Winchester ("Winchester") was D.L.'s Early Childhood Special Education Teacher. She worked with D.L. daily from November 2019 to May 2022. During that time, she found it difficult to evaluate D.L.'s cognitive abilities because she would often refuse to complete tasks when Winchester wanted. Still, she concluded D.L. "was a very smart girl" who would show her skills when she wanted. She also found that D.L. worked better one-on-one and was generally unable to complete a task with just one prompt.

As for observed behaviors, Winchester noted D.L. banged her head with her hand, scratched, ripped pages from books, threw things, and cried among other things. Based on her experience, Winchester determined the behaviors were an aspect of her autism and not a separate behavioral concern.

In April 2022, the Les and OPS began to consider D.L.'s educational needs for kindergarten. D.L. attends school under an "individualized education program" ("IEP"). *See* 20 U.S.C. § 1414(d)(1)(A), (d)(2)(A). In basic terms, an IEP "is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (quoting *Bd. of Educ. Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982)).

To prepare an IEP, a team consisting of the child's parents, teachers, and school officials (the "IEP team") collaborate to prepare a comprehensive plan for educating the

---

[2]In 2021, OPS considered whether to reevaluate D.L. or rely on existing data. With input from the Les, OPS decided to rely on existing data because reevaluating her would not provide additional information and her verification and services would not change.

child "in compliance with a detailed set of procedures." *Id.* (citing 20 U.S.C. § 1414(d)(1)(B)). The relevant procedures "require careful consideration of the child's individual circumstances" so that the plan for services can be tailored to the child's unique needs. *Id.* (citing 20 U.S.C. § 1414). An IEP meets the school's substantive obligations under the IDEA if it is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 399.

D.L.'s IEP team determined D.L. would attend kindergarten at Saddlebrook for the 2022-2023 school year. In reaching that conclusion, it considered various factors, including her "difficulties with attention, fine motor skills, and self-help skills." At that time, it did not consider her "to have behavioral concerns that affected her ability to learn."

At Saddlebrook, D.L. spent time in a general-education classroom with non-disabled peers and time in a special-education classroom as support. D.L. struggled in the general-education classroom from the start. OPS responded by implementing changes to D.L.'s learning environment and providing additional support.

D.L.'s IEP team met on February 23, 2023, to address how to better support her in a general-education classroom. The team decided to have her spend more time in the resource room with a special-education teacher because she did better there. The team also noted that D.L.'s screaming and crying disrupted the general-education classroom and that she was starting to exhibit aggressive behaviors like hitting and kicking staff. The team added a Functional Behavior Assessment ("FBA") and Behavioral Intervention Plan ("BIP") to her IEP and updated D.L.'s goals.

The February 23, 2023, IEP did not contain any behavioral goals or objectives despite her history of challenging behaviors. The parties dispute whether OPS staff worked with D.L. to teach her replacement behaviors, to minimize triggers, and to teach her to communicate her needs or just take a break. The plaintiffs maintain OPS never carried out the articulated steps for creating a BIP for D.L.

The team met again on April 25, 2023, to discuss those changes and D.L.'s increased behaviors, such as "self-selecting" not to participate in the general-education classroom. The Les again asked for more resource time.

The plaintiffs fault OPS for D.L.'s lack of progress at school. D.L.'s updated IEP included one "communication" but did not add a specific intervention plan to teach D.L. to communicate to address her challenging behaviors. Both IEPs included a section for a "Behavioral Assessment and Intervention Plan," but they were incomplete—leaving the section for replacement behaviors blank. A section for behavioral goals and objectives in the February IEP had also been left blank. The plaintiffs' expert witness, Dr. Johanna Higgins ("Dr. Higgins"), testified the missing elements meant D.L.'s IEPs were not reasonably calculated to allow her to make appropriate progress toward her goals. OPS asserts that D.L.'s IEPs identified problem behaviors such as "hitting/kicking staff" and "screaming" and identified appropriate replacement behaviors in other parts of her IEPs.

At the April 25, 2023, IEP meeting, the team decided to change D.L.'s placement to OPS's Alternative Curriculum Program ("ACP") for first grade in the fall—a program Saddlebrook did not have. One key aspect of OPS's ACP curriculum is its focus on students with cognitive disabilities. The plaintiffs point out the revised IEP contained confusing inconsistencies regarding her placement. They also question why she was placed in ACP despite the lack of evidence of any cognitive disability.

In August 2023, D.L. began first grade in the ACP classroom at Prairie Wind Elementary ("Prairie Wind"). It did not go well. She lasted only about seventeen days. The Les removed her after another student in her classroom hit her and scratched her on her face and neck multiple times. D.L. was very upset and by the second week, was afraid to go to school. When she got dropped off, she would hide behind the classroom door.

Christine Pereira ("Pereira"), a special-education teaching and learning consultant for OPS, observed the ACP classroom on the first day of the 2023-2024 school year and

4

described it as "very chaotic" with children running around, climbing on shelves, throwing toys, and crying. She attributed the "bad situation" to a new teacher and a shortage of consistent support staff throughout the district. With OPS taking steps to improve the situation, Pereira testified she was more concerned about D.L.'s unwillingness to participate in the classroom instruction.

Worried for D.L.'s safety, the Les stopped sending her to school after September 1, 2023. They urgently began emailing OPS administrator Jo Gunderson ("Gunderson") to try to change her placement. The Les continued to follow up with Gunderson and Pereira, both of whom thought the Les wanted a transfer to another ACP classroom. On September 18, 2023, Pereira suggested an IEP meeting to discuss available options. A few days later she told them Prairie Wind would reach out to get the IEP scheduled.

On September 28, 2023, the Les sent an email to OPS's Director of Special Education Kara Saldierna ("Saldierna") begging her "to find a safe place for [D.L.] so she can go back to school to have education." They advised her they had already addressed the issues with D.L.'s teacher, the principal, and Pereira but that nothing changed.

The Prairie Wind IEP team finally convened on October 9, 2023. Pereira served as the OPS representative with knowledge of the resources available in the district. None of the team members was from Saddlebrook. After discussing their options, the IEP team decided D.L. should "continue with an alternate curriculum but" could return to Saddlebrook, even though it did not have an ACP classroom. OPS told the Les it would arrange for D.L. to return to Saddlebrook in a couple of days. The plaintiffs characterize this decision as a change of educational placement. OPS denies that characterization.

According to OPS, the agreement to let D.L. return to Saddlebrook was a mistake. A few days after the meeting, Saldierna—responding to an email from the Les asking to "please press the button to help the process speed up"—advised the Les that she had reviewed the IEP, but D.L. could not return to Saddlebrook because it did "not have

5

adequate staff and services to implement the IEP." She asked whether the Les wanted a transfer to an ACP classroom at Oak Valley—an option the IEP team had rejected. The Les felt D.L. would do better at Saddlebrook even without ACP.

As of October 23, 2023, D.L. had not been attending school for almost two months. In that time, OPS neither provided educational services to her nor asked for the Les' consent to reevaluate her to determine her educational needs.

On November 30, 2023, the plaintiffs filed a due-process petition with the Nebraska Department of Education, alleging OPS was violating D.L.'s right to a FAPE in the LRE. *See* 20 U.S.C. § 1415(f). After they invoked the IDEA's Maintenance of Current Educational Placement, or "stay-put" provision, *see id.* § 1415(j), the assigned hearing officer ("hearing officer") entered an Order for Stay-Put Placement finding that D.L.'s last agreed-upon placement under the October 9, 2023, IEP was for alternative-curriculum instruction at Saddlebrook.

On January 16, 2024, D.L. returned to school at Saddlebrook, which adjusted its resources to comply with the stay-put order and meet D.L.'s educational needs. From then, she spent most of her day in a special-education classroom with some time in a general-education classroom. She completed the second grade in May 2025. As D.L. progressed through grade levels, her services increased with respect to both academic instruction and functional daily living.

In the meantime, the plaintiffs' administrative claim moved forward. On February 1, 2024, the Les formally requested an independent educational evaluation ("IEE") to include an FBA and an assistive technology evaluation. A week later, the hearing officer continued the scheduled hearing because the parties had agreed to pursue an IEE.

Torri Smith Tejral ("Smith Tejral"), a Board Certified Behavioral Analyst, Registered Behavior Technician, and Director of Clinical Services for Childhood Autism

Services, emailed Saldierna what the plaintiffs describe as a completed IEE, including an FBA and a BIP. Among other things, Smith Tejral recommended that D.L. receive Applied Behavior Analysis ("ABA") therapy but did not recommend where those services should take place. She asked Saldierna when they could meet to discuss her report. Saldierna did not respond, and OPS denies Smith Tejral's report was a completed IEE report.

In the Spring of 2024, the Les attempted to schedule additional IEE assessments at OPS's request. Saldierna provided the needed authorizations as the Les requested, but the only evaluation D.L. received was the one from Smith Tejral. That summer, the Les asked OPS to convene the IEP team to discuss Smith Tejral's report, which included specific recommendations for intensive intervention for at least 25 hours per week, one-on-one teaching based on ABA principles, and behavior-skills training for OPS staff. OPS denied their request.

On November 4, 2024, OPS convened a meeting of D.L.'s IEP team. They discussed D.L.'s existing support services, behaviors, "academic and functional performance," and progress at Saddlebrook. The plaintiffs again asked about reducing D.L.'s time in the general-education classroom in favor of the resource room.

Smith Tejral attended the meeting and made additional recommendations. OPS implemented her FBA and incorporated most of her proposed BIP into D.L.'s IEP. Smith Tejral suggested that including more-current observations would be beneficial.

OPS found her input helpful but contends it did not drastically change what D.L.'s team was already doing to help her. OPS maintains that ACP is the appropriate placement and the LRE for D.L. In support, it cites testimony from OPS staff that has worked with D.L. and asserts that some of the testimony from the plaintiffs' own experts, including Smith Tejral and Dr. Higgins, support that conclusion.

The plaintiffs adamantly disagree. In their view, ACP "is more restrictive than a special education resource room not designed only for students with cognitive disabilities."

7

They contend OPS repeatedly violated D.L.'s right to a FAPE in the LRE despite their repeated pleas for help.

The parties put their arguments to the test before the hearing officer in late 2024. After a three-day due-process hearing at which experts for both sides testified, the hearing officer found the plaintiffs had not met their burden of proving OPS failed to provide D.L. a FAPE or otherwise violated the IDEA (Filing No. 6 at 431). Changing her view of D.L.'s placement, she also vacated her prior stay-put order. She decided D.L.'s last-agreed-upon educational placement was for ACP and deferred to OPS's administrative decision as to the proper school to provide that programming.

On June 17, 2025, the plaintiffs sought judicial review under the IDEA (Filing No. 1). *See* 20 U.S.C. § 1415(i)(2) (describing the right to bring a civil action). They seek a reversal of the hearing officer's "decision and a remedy for the educational losses D.L. incurred by having been denied a" FAPE in the LRE as required by the IDEA.

OPS opposes (Filing No. 34) the plaintiffs' motion and "moves the Court for an order upholding the hearing officer's decision in the due process hearing, granting judgment in its favor on [] Plaintiffs' IDEA claims, and dismissing such claims with prejudice." Noting the Court previously denied (Filing No. 23) the plaintiffs' request for a temporary restraining order and preliminary injunction (Filing No. 8) regarding D.L.'s placement, OPS contends the Court already correctly decided that D.L.'s October 2023 IEP team identified D.L.'s educational placement as ACP. OPS concedes the "Court did not make a determination on the merits in" denying that motion yet maintains the plaintiffs fail to prove any of their IDEA claims.

## II.   DISCUSSION

### A.   Standard of Review

Judicial "review under the IDEA is limited." *Kass v. W. Dubuque Cmty. Sch. Dist.*, 101 F.4th 562, 570 (8th Cir. 2024); *see also Osseo Area Sch., Indep. Sch. Dist. No. 279 v.*

*A.J.T. ex rel. A.T.*, 96 F.4th 1062, 1065 (8th Cir. 2024) ("Courts are limited to reviewing whether the school district followed the IDEA's procedures and whether the student's IEP provided a FAPE."). Those limits reflect the recognition that "judges are not trained educators," *Kass*, 101 F.4th at 570 (quoting *E.S. v. Indep. Sch. Dist., No. 196 Rosemount-Apple Valley*, 135 F.3d 566, 569 (8th Cir. 1998)), and don't "have a free hand to impose substantive standards of review which cannot be derived from the" IDEA, *Rowley*, 458 U.S. at 206.

In evaluating a challenge to an administrative decision, the Court reviews the administrative record, hears additional evidence as necessary, and grants relief as appropriate based "on the preponderance of the evidence." *See* 20 U.S.C. § 1415(i)(2)(C). The burden of persuasion under § 1415 is "on the party seeking relief." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005); *accord M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 458 (8th Cir. 2008). "An IEP is set aside 'only if procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *Park Hill Sch. Dist. v. Dass*, 655 F.3d 762, 766 (8th Cir. 2011) (quoting *Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d 419, 424 (8th Cir. 2010)).

Although the Court independently decides "whether the IDEA was violated," *B.S. ex rel. K.S. v. Anoka Hennepin Pub. Schs.*, 799 F.3d 1217, 1220 (8th Cir. 2015), it "must give 'due weight' to the results of [the administrative] proceedings, resisting any impulse to 'substitute [its] own notions of sound educational policy for those of the school authorities,'" *E.S.*, 135 F.3d at 569 (second alteration in original) (quoting *Rowley*, 458 U.S. at 206). "This somewhat 'unusual' standard of review is less deferential than the substantial-evidence standard commonly applied in federal administrative law." *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011) (quoting *Indep. Sch. Dist. No. 283 v. S.D. by J.D.*, 88 F.3d 556, 561 (8th Cir. 1996)).

The Eighth Circuit has long "recognized that this limited grant of deference—'due weight'—is appropriate in IDEA cases because the [administrative decisionmaker] 'had an opportunity to observe the demeanor of the witnesses,'" *K.E.*, 647 F.3d at 803 (quoting *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003)), and because judges "lack the specialized knowledge and experience necessary to resolve difficult questions of educational policy," *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1028 (8th Cir. 2003). As such, the Court's "review is focused on 'whether [an] IEP is *reasonable*, not whether the court regards it as ideal.'" *Minnetonka Pub. Sch., Indep. Sch. Dist. No. 276 v. M.L.K. ex rel. S.K.*, 42 F.4th 847, 852 (8th Cir. 2022) (quoting *Endrew F.*, 580 U.S. at 399).

### B.     Alleged IDEA Violations

The plaintiffs allege both procedural and substantive violations of the IDEA. In their motion for a judgment on the administrative record, the plaintiffs ask the Court to

1.  Reverse the decision and order of the Hearing Officer dated April 3, 2025;
2.  Declare that OPS has deprived D.L. of a [FAPE] since the Spring semester of the 2022-2023 school year, and that OPS deprived D.L. of a FAPE in the [LRE] through the entirety of the Fall semester of the 2023-2024 school year;
3.  Declare and issue an order that D.L.'s appropriate educational placement in the [LRE] consists of appropriate instruction, services, and supports provided in the special education classroom at the public school closest to her home, Saddlebrook Elementary School, with some time spent in the general education environment with nondisabled peers;
4.  Order OPS to fund an updated [FBA] and [BIP] to be performed by an independent evaluator mutually agreed upon by the parties to capture D.L.'s current behavioral needs;
5.  Order OPS to provide D.L. with appropriate compensatory education services in her placement in the special education classroom and general education environment at Saddlebrook Elementary School, including at least 25 hours per week of intensive, appropriate behavioral instruction and interventions for 30 school weeks and at least 80 hours of one-on-one academic tutoring;
6.  Declare that [they] are the prevailing party pursuant to 20 U.S.C. § 1415(i)(3)(b) and order OPS to pay [their] reasonable attorney's fees and costs; and

      7.      Grant any other relief for Plaintiffs that this Court deems just and appropriate.

As specific grounds for reversal, the plaintiffs argue the hearing officer erroneously concluded OPS provided D.L. with a FAPE in 2023. As they see it, her IEPs for February, April, and October 2023 were not only insufficient but were also inconsistently implemented. They point to the lack of adequate goals and objectives to address the challenging behaviors D.L. exhibited in kindergarten at Saddlebrook and the IEP team's failure to include a complete or cohesive intervention plan to address those behaviors. *See Neosho*, 315 F.3d at 1027 n.3 (explaining it could not "conclude that an IEP is reasonably calculated to provide a [FAPE] if there is evidence that the school actually failed to implement an essential element of the IEP that was necessary for the child to receive an educational benefit").

The plaintiffs next contend the hearing officer erroneously concluded that the ACP classroom at Prairie Wind provided D.L. a FAPE in the LRE. They argue OPS should have tried to provide "appropriate services and behavioral interventions at" Saddlebrook before sending her to "a segregated and chaotic environment" at a different school. *See* 20 U.S.C. § 1412(a)(5) (requiring the LRE "[t]o the maximum extent appropriate"). Noting that ACP "is a program for students with cognitive disabilities," they emphasize that OPS placed D.L. in that program "despite never having determined that she had a cognitive disability." The plaintiffs contend that guesswork placement was "an egregious violation of" the requirement that an IEP be "informed by comprehensive, formal evaluations" to properly "identify what the child's educational needs are." *See* 20 U.S.C. § 1414 (describing the procedures and requirements for evaluations and reevaluations under the IDEA); 34 C.F.R. § 300.304 (same).

In their view, the specific "placement details in D.L.'s April 2023 IEP were incoherent," leaving the Les unable to understand OPS's reasoning and meaningfully participate in the IEP process. Highlighting Pereira's testimony that the ACP classroom was "very chaotic" and a "bad situation," the plaintiffs assert the hearing officer's

conclusions that D.L. needed ACP and that OPS provided a FAPE at Prairie Hills are "simply not supported by evidence in the record." They believe the hearing officer improperly ignored the unsafe environment D.L. faced in the ACP classroom and the trauma it caused her. *See* 34 C.F.R. § 300.116(d) (requiring consideration of "any potential harmful effect on the child or on the quality of services which he or she needs" in deciding the LRE).

Turning to the time D.L. did not attend school, the plaintiffs contend OPS denied D.L. a FAPE by dragging its feet on finding D.L. a safe educational placement. They cite the absence of any updated evaluations or efforts to provide appropriate services to address D.L.'s "disability-related anxiety and school-avoidance behaviors." They fault the hearing officer for concluding that offering information about a transfer to another ACP school satisfied OPS's obligations under the IDEA despite leaving D.L. "with no instruction, supports, or schooling of any kind in the 38 days that it took for OPS to call an IEP meeting to find a safe place for her to attend school." As they see it, compensatory services, which have been approved by the Eighth Circuit in some circumstances, *see Kass*, 101 F.4th at 567, "are required to restore [D.L.] to the position in which she should be at this time but for those denials of FAPE."

The plaintiffs find an additional IDEA violation in Saldierna's purported "veto" of D.L.'s IEP team's October 9, 2023, educational placement decision for alternate curriculum in the special-education classroom at Saddlebrook. Although they acknowledge that "a physical school building is not synonymous with an IEP educational placement," the plaintiffs argue that D.L.'s IEP team made Saddlebrook an integral part of her placement—meaning Saldierna could not lawfully overrule or otherwise alter that decision. They contend the IEP team made a rational decision under difficult circumstances and the only mistake was Saldierna and the hearing officer thinking the IDEA permitted Saldierna to unilaterally "correct" it "outside of the IEP team process."

12

The plaintiffs' last alleged error relates to D.L.'s rights to an IEE at OPS's expense. *See* 34 C.F.R. § 300.502(b)(1), (c)(1). More specifically, they argue OPS denied D.L. a FAPE by denying the Les' initial request for an IEP team meeting and by needlessly failing to timely consider Smith Tejral's IEE and related recommendations. The plaintiffs contend they are still seeking to have OPS implement "recommended appropriate interventions . . . to this day."

OPS urges (Filing No. 34) the Court to reject the plaintiffs' challenges to the hearing officer's decision and order, arguing their effort values "form over substance" and is "largely based on misapplications of the law and assertions of fact that are either unsupported by or flatly contrary to the evidence in the administrative record." Unsurprisingly, OPS finds a lot more to like in the hearing officer's decision than the plaintiffs do. As they see it, she correctly concluded OPS provided D.L. a FAPE in the Spring of 2023 despite some blank sections in the IEP because D.L.'s behavioral issues were adequately addressed elsewhere in her IEP and as a practical matter at school.

As for the plaintiffs' objections to D.L.'s educational placement in ACP, OPS denies the program is only for children with cognitive disabilities. It further contends the "assertion, based on an evaluation that was conducted November 2018, that D.L. could not have an intellectual or cognitive disability is not supported by the record." It points to testimony from an OPS expert in child psychology that formal testing is not "always needed" and that staff observations of D.L. over time indicated that she does have cognitive delays or other impairments that made ACP a good fit regardless.

OPS also pushes back on the assertion that the Les were so confused that they could not meaningfully participate in formulating D.L.'s IEP. It states that the Les actively participated in the process and understood what decisions the IEP team collaboratively made for the end of kindergarten at Saddlebrook and the transition to the ACP classroom at Prairie Hills for first grade. With respect to the "bad, chaotic situation" at Prairie Hills, OPS contends Pereira's testimony on that point related only to the first day of school, not

13

"the first five weeks of the 2023-24 school year" as the plaintiffs contend. OPS acknowledges "there were some initial challenges in Prairie Wind's ACP classroom at the start of the school year that may have contributed to D.L.'s struggles in adapting to a new environment" but asserts that "does not mean OPS denied her FAPE during her *mere* 17 days of attendance and certainly does not undermine the decision four months prior to place her in ACP."

OPS next argues it "did not deny D.L. FAPE during the 38 days her parents withheld her from school." According to OPS, the plaintiffs unfairly imply OPS did nothing while its team was in fact actively working to help the plaintiffs arrange a transfer to a different ACP classroom at another school. When that did not happen, Pereira suggested scheduling an IEP meeting to "problem solve . . . to get [D.L.] back in school." OPS blames the Les for keeping D.L. at home despite having other options for a FAPE.

OPS also rejects the plaintiffs' assertion that Saldierna "vetoed" the IEP team's educational placement by advising the Les that the team had made a mistake in saying that D.L. could return to Saddlebrook even though it had no ACP classroom. OPS maintains D.L.'s October 2023 placement was ACP and Saldierna sufficiently addressed the Les' safety concerns by offering a transfer to the ACP classroom at Oak Valley where she could begin receiving a FAPE "within a day or two."

OPS last asks the Court to affirm the hearing officer's determination that it did not unduly delay review of Smith Tejral's report. As OPS sees it, "the hearing officer correctly determined that even if [OPS's] delay in reviewing [Smith Tejral's] BIP had been unreasonable and therefore a procedural violation, . . . there was no evidence of any deprivation of benefits and therefore no violation of the IDEA."

This is a sad case. Though the parties obviously disagree as to whether D.L. suffered any actionable IDEA violations, D.L.'s educational experiences at OPS have undeniably and unfortunately been far from ideal. Her IEPs and educational progress would leave any

14

reasonable parent unsatisfied. Whether for a few weeks or just one day, D.L. should not have to go to school in a "bad situation" that OPS's own special-education expert described as "very chaotic" with children running around, climbing on shelves, throwing toys, and crying. There is more than a grain of truth in the plaintiffs' observation that OPS's arguments sound—at times—more like an explanation for its failures, especially in the ACP classroom at Prairie Wind, than "a cogent and responsive explanation for [its] decisions that" show it provided D.L. an individualized education and related services that were "reasonably calculated to enable" her to make appropriate progress in light of her circumstances. *Endrew F.*, 580 U.S. at 404.

That said, the IDEA does not require perfection or an optimal educational experience; it requires only reasonableness. *See Endrew F.*, 580 U.S. at 399; *Kass*, 101 F.4th at 570; *Parrish v. Bentonville Sch. Dist.*, 896 F.3d 889, 895 (8th Cir. 2018) ("The District's strategies, while they might have been imperfect, complied with the IDEA."); *M.M. v. Dist. 0001 Lancaster Cnty. Sch.*, 702 F.3d 479, 487 (8th Cir. 2012) ("It is 'largely irrelevant' if the school district could have employed 'more positive behavior interventions' as long as it made a 'good faith effort' to help the student achieve the educational goals outlined in his IEP." (quoting *CJN*, 323 F.3d at 639)). A FAPE will "not necessarily fit precise parental preferences, maximize a student's potential, or provide the best possible education at public expense." *D.L. by Landon v. St. Louis City Sch. Dist.*, 950 F.3d 1057, 1064 (8th Cir. 2020). A school satisfies the IDEA if it "simply provide[s] the student with a FAPE consistent with the IEP." *Kass*, 101 F.4th at 570 (quoting *Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015)).

Mindful of its own limitations and giving "due weight" to the results of the thorough and well-reasoned administrative proceedings in this case, the Court concludes OPS sufficiently complied with the relevant procedures required by the IDEA and consistently provided D.L. a FAPE in the LRE under the circumstances. *Rowley*, 458 U.S. at 206-07 (explaining that when a school has complied with its obligations under the IDEA, "the

15

courts can require no more"); *see also* 20 U.S.C. § 1415; *Kass*, 101 F.4th at 568 ("The IDEA's principal purpose is to ensure all students with disabilities 'have available to them a free appropriate public education.'" (quoting *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 166 (2017)). In particular, the Court agrees with the hearing officer that a preponderance of evidence supports OPS's placement of D.L. in the ACP program and that OPS sufficiently identified and addressed D.L.'s behaviors in an effort to help her reach her educational goals. While D.L.'s situation was unnecessarily messy for a short time and the process could have been clearer, the Court concludes OPS did not violate the plaintiffs' rights under the IDEA.

Based on the foregoing,

IT IS ORDERED:
1. Plaintiffs D.L., a minor child, by and through her parents and next friends, Duc Le and Anh Le's Motion for Judgment on the Administrative Record (Filing No. 24) is denied.
2. Defendant Omaha Public Schools's Motion for Judgment on the Administrative Record (Filing No. 28) is granted.
3. This case is dismissed with prejudice.
4. A separate judgment will issue.

Dated this 4th day of November 2025.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge